(54 App. Div. 137.)

### LATOURETTE v. LATOURETTE.

(Supreme Court, Appellate Division, Second Department. October 26, 1900.)

1. HUSBAND AND WIFE—FRAUDULENT CONVEYANCES—BURDEN OF PROOF—PRESUMPTIONS.

    Where, in an action to set aside a transfer of property by plaintiff to his wife on the ground of fraud, due execution of the conveyances was proven, the burden was on the plaintiff to show their invalidity and his own incompetency, there being no presumption that he was dominated by his wife or that the transfer was fraudulent.

2. SAME—FRAUD—EVIDENCE—SUFFICIENCY.

    Where plaintiff transferred his property to his wife after consulting competent attorneys, and where there was testimony that his family physician had prescribed opium and morphine for his use, and of several other physicians that plaintiff's mind was clear and rational, evidence that he was a man of advanced years, and addicted to the use of morphine and affected with epilepsy, and that his wife, who had received a diploma as a physician before her marriage, administered morphine to him, was not sufficient proof of fraud to invalidate the conveyance.

Appeal from special term, Queens county.

Action by Richard C. Latourette against Jennie B. Latourette. From a judgment dismissing the complaint on the merits, plaintiff appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, HIRSCHBERG, and JENKS, JJ.

David Thornton, for appellant.
John R. Reid, for respondent.

JENKS, J. The plaintiff appeals from a judgment of the special term that dismissed the complaint on the merits. The suit is brought by husband against wife to avoid his transfers and conveyances to her on the ground of her fraud. The learned special term found that the transfers and conveyances were voluntarily made, by a competent person, who was not in duress, and not subject to undue influence or to fraud. I think that the findings are with the weight of evidence, and that no errors were committed which warrant a reversal of the judgment.

The plaintiff was not armed with any presumption of inequality arising from the relation of the parties, like that arising in controversy between guardian and ward, trustee and cestui que trust, attorney and client, and the like, where controlling influence is an intendment. The law does not presume that the head of the family is dominated by the wife, and hence it follows in this case that the alleged fraud must be proved, and the question of fact must be determined by the circumstances of the case. Cowee v. Cornell, 75 N. Y. 91, 101.

On the other hand, upon proof of the due execution of the instruments of transfer, their validity and the competency of the plaintiff were presumed. The conveyances of real estate can only be invalidated by evidence "clear and convincing beyond reasonable controversy." Taylor v. Taylor (Sup.) 13 N. Y. Supp. 55, citing authorities, affirmed in 129 N. Y. 623, 29 N. E. 1029.

In 1889 the plaintiff, when nearly 60 years old, married the defendant. In January, 1894, he conveyed to her the homestead in Amityville, then in their joint names, and in September of that year he further conveyed the rest of his realty situate in Richmond county, and made to her a transfer of 30 railroad bonds, of the par value of $30,000. The parties lived together until July, 1897, when plaintiff fled his home to his relatives, and six months thereafter brought this suit. In face of the conveyance of January, 1894, plaintiff testified that he knew nothing about it. Confronted with the conveyances and the transfer, both of September, 1894, he said that he knew nothing about them; that he was insensible half of the time from drugs, and particularly morphine, largely administered by the defendant. In brief, the plaintiff testifies that he was for years so dosed and drugged while held in durance that his mind was a blank, and he was a mere passive thing. The conveyance of January, 1894, was drawn by an attorney of probity in his profession for 20 years. He testifies that the defendant instructed him; that thereafter both parties came to his office; that both talked with him; and that the plaintiff signed and executed the conveyance before him when he seemed rational and in fairly good health. He further testifies that he had gone to the plaintiff's house before this time relative to a transfer of personalty, but that the plaintiff himself then postponed the business. The second conveyance and the transfer of the personalty were prepared by another attorney, who now appears for the defendant. This gentleman is a lawyer of long and active professional life, who has attained a high standing at our bar. He testified that the parties, as strangers, consulted him, and that the plaintiff stated that he wished these conveyances and transfers of all his property to be made to his wife. The witness then told the plaintiff that this was an unusual step, and sent him away until the next day; and on the next day, when the plaintiff still insisted, the witness took the data, and postponed the meeting for a week, when the conveyance was executed, the transfer was made, and the key of the depository of the bonds was delivered, all before or in the presence of the attorney. Dr. Wilsey, superintendent of the insane asylum at Amityville, testified that the plaintiff sent for him in December, 1893, to observe his

mental condition, because he feared that his sister and his nieces might accuse his wife as he now accuses her. The plaintiff stated to Dr. Wilsey that his wife was kind, and that he wanted her to have his money. The plaintiff then and at various subsequent interviews seemed entirely rational. In 1896 he complained to the witness that his sister had visited him but once in years; that then she acted as a savage, and only wanted his money; that his nieces were provided for; and that he had made the disposition of his property as he wished. In 1895 he complained that his wife did not allow him all the freedom he wished, but said that he "teased her, and got some satisfaction." Dr. Carlos F. McDonald examined the plaintiff in 1892, in 1893, twice in 1894 and in 1895, respectively, and in 1896, when plaintiff always appeared sane. This witness thought that the plaintiff suffered from a nervous affection, diagnosed as an irregular form of epilepsy, and from the symptoms described believed that plaintiff had periodical attacks of unconsciousness. But Dr. McDonald thought that the plaintiff's mind was neither weak nor cloudy, but that it was perfectly clear and rational. The patient was sometimes irritable, petulant, and fault-finding with his wife. On one occasion he claimed that she interfered, and would not let him have his own way; on another he commended her as a wife and as a nurse. Several of plaintiff's neighbors, who were not impeached, testified that he had told them of this disposition of his estate. The clergyman, Edwards, told of a protracted conversation, in the absence of the defendant, when the plaintiff said that he thought it best to put his property in his wife's hands; that his own relatives cared little for him, and that he remembered his wife's kindness to him.

The plaintiff replies to the testimony of these witnesses by testifying, in reply to Mr. Edwards: "I talked to him, but nothing of any account, because I was incompetent to talk. I was incompetent. I remember I was incompetent at the time; yes, any time. Yes, I remember I was incompetent any time I talked with those other men I have spoken of." The plaintiff testified that he learned the morphine habit from "her drugging," and that he continued to take morphine after he left his wife up to about a year before the trial, though in gradually reduced quantities. He afterwards testified that he never took a bit of morphine except that the defendant gave it to him, but that she did not force him. He had to take it, but that it was administered in too large quantities. I quote thus to show that the plaintiff took the drug. The defendant states that she gave him homeopathic coffee in 1892, and a solution of deodorized opium in 1893, but that she never gave him any morphine or morphia before 1895. She further testifies that he was addicted to strong drink, and that she had discovered his secretion at different times of bottles of morphia, and that she had refused to comply with his requests for the drug. Dr. Wilsey testifies that in May, 1894, he prescribed nux vomica, and previously iodide of potash and other medicines, and that he had heard from the patient during his attendance that opium had been given to him in November, 1895. Dr. McDonald learned of the administration, throughout his visits, of deodorized tincture of opium and some other remedies, under the advice of Dr. Wilsey, and

also of morphia. Certainly these statements tend to refute the theory that the defendant was engaged in the secret administration of drugs to murder the mind and to wreck the body of her husband. I credit the testimony of the plaintiff that he took, from time to time, quantities of medicines and drugs, and several that benumb and deaden. I believe that such may have been their effect at times upon him. I believe that some of these medicines or drugs were administered by his wife, who before marriage had taken her diploma as an electropathic physician. But I cannot conclude from the testimony of the plaintiff, or from any evidence claimed to sustain him, that the defendant for years, under the guise of wifely care, sought to kill the mind of her husband, that she might rob the imbecile she had made. The allegations of imprisonment are negatived by several disinterested witnesses. I shall not discuss in detail the testimony of the defendant, who claims that her conduct, which the plaintiff terms imprisonment, was simply care warranted by his failings, and which, if her story be believed, shows that she only demeaned herself as a good wife. I have preferred to try the plaintiff's testimony by that of witnesses who are not as naturally interested as the defendant.

Finally, this disposition of property, if unusual, was not unnatural in a man advanced in years and afflicted with epilepsy. None dependent on him was disregarded; none naturally an object for his bounty was cut off. The defendant has remained at home, inviting the plaintiff to return, in homely and in affectionate phrase, not with the formalities that would go to make a record. The defendant testified that the understanding between them was that he was to have a home with her, and equity might well impress a trust, if he sought its aid, that would afford to him a home for his life. Schouler, Husb. & Wife, § 389, citing Edgerly v. Edgerly, 112 Mass. 175, 177; Seibold v. Christman, 7 Mo. App. 254. None of the exceptions taken presents any error sufficient to upset the judgment.

Judgment affirmed, with costs. All concur.